## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**GREGORY A. THOMPSON, JR.**                                   **CIVIL ACTION**

**VERSUS**

**UOP LLC**                                                             **NO. 20-00454-BAJ-SDJ**

## RULING AND ORDER

This is an employment discrimination case. Plaintiff alleges that while employed by Defendant UOP LLC he suffered harassment and retaliation due to his race (African-American), in violation of federal and state law.[1]

Now before the Court is UOP's **Motion For Summary Judgment (Doc. 30)**, seeking dismissal of Plaintiff's action. Plaintiff opposes UOP's Motion. (Doc. 33). For the reasons stated herein, UOP's Motion will be denied and Plaintiff's claims of hostile work environment and retaliation will be submitted to a jury.

### I.    BACKGROUND

#### A. Summary Judgment Evidence

The facts set forth below are drawn from UOP's Statement Of Undisputed Material Facts (Doc. 30-1, "UOP SOF"), Plaintiff's Opposition to UOP's Statement of Material Facts (Doc. 33-28, "Opposing SOF"), UOP's Reply Statement Of Material Facts (Doc. 39-1, "Reply SOF"), the parties' joint Pre-Trial Order (Doc. 51, "Joint PTO"), and the record evidence submitted in support of these pleadings.

---

[1] Plaintiff's original Complaint also asserts various claims of disparate treatment in violation of federal and state law, and a violation of the Louisiana Whistleblower Statute. Plaintiff has since abandoned all but his harassment and retaliation claims. (*See* Doc. 51 at ¶ B).

### i.  UOP Operates Its Baton Rouge Facility According To Defined Safety Rules And Procedures

UOP is a subsidiary of Honeywell International Inc., and specializes in the production and processing of petrochemicals and natural gas. In August 2014, UOP hired Plaintiff as an hourly Operator at its Baton Rouge, Louisiana manufacturing facility. (Joint PTO at ¶ F(5)). Plaintiff is African-American. (*Id.* at ¶ F(2)).

UOP's Baton Rouge facility produces activated alumina and versal alumina, products used in sulfur and mercury removal and in specialty polishing applications. (*Id.* at ¶ F(6)). Relevant here, the alumina manufacturing process requires flocculent ("floc"), "a concentrated product that is mixed with water." (*Id.* at ¶ F(7)).

Not surprisingly, UOP maintains safety policies and procedures for its operations, which include "Cardinal Safety Rules" setting forth offenses that are grounds for an employee's immediate termination, "even for the first offense and regardless of previous performance." (*See id.* at ¶ F(14)). Among these, Cardinal Safety Rule 5 prohibits employees from "knowingly" violating "a life safety permit or life safety critical procedure." (*Id.* at ¶ F(15)). UOP's Lock/Tag/Try Procedure (LTTP)[2]—explained below—is a "life safety critical procedure" governed by Safety Rule 5, for which a knowing violation is sanctionable "up to and including termination." (*Id.* at ¶ F(15)).

### ii.  UOP's LTTP Sets Forth Safety Procedures Applicable To The Main Waterline

The purpose of the LTTP "is to protect UOP-BTR employees and contractors

---

[2] UOP's LTTP is submitted as an exhibit to the Declaration of Ashley Barnes. (*See* Doc. 30-7 at pp. 26-58, *hereinafter* "LTTP").

from hazards associated with the unexpected startup or release of store energy in machines or equipment." (LTTP § 1.1). At a high level of generality, the LTTP "is how operations, maintenance, or other personnel may be assured that a potentially dangerous system is properly shut down, isolated, and verified prior to starting service or maintenance activities." (LTTP § 1.2 (emphasis in original)). The LTTP applies to all personnel at UOP's Baton Rouge facility. (LTTP § 1.5). Plaintiff was trained on the LTTP. (Joint PTO at ¶ F(12)).

More specifically, the LTTP sets forth standard procedures that must be followed prior to turning on (*i.e.*, "energizing") and turning off (*i.e.*, "de-energizing") energy conducting devices or equipment. (LTTP § 1.3). Among these, LTTP Section 4.8 sets forth what paperwork must be prepared, approved, and referenced:

> 4.8    If an ECP[3] does not exist, one shall be developed and approved prior to the initiation of lockout[4].
>
>     …
>
> 4.8.2  The ECP shall be prepared, verified and approved prior to beginning the job.
>
> 4.8.3  Utilize ECP's [sic] for each machine, system or piece of equipment.
>
> 4.8.4  The ECP shall be approved by the Shift Supervisor, Operations Coordinator, or the Owning Department Manager.

(*Id.* at p. 32 (LTTP § 4.8)).

---

[3] The LTTP defines an ECP, or "Energy Control Procedure" as "[a] document that lists all sources of energy and the associated energy isolation points for a specific piece of equipment or process, as well as the steps to effectively de-energize and reenergize the system." (LTTP § 19).

[4] The LTTP defines a "lockout" as "[t]he placement of a lock and hardware on an energy isolating device ensuring that the energy isolating device and the equipment being controlled cannot be operated until the lockout device is removed." (LTTP § 19).

Additionally, Section 7.3.11 sets forth the steps that must occur prior to *starting* a job:

> 7.3.11.1    **Prepare for Startup** – The <u>Authorized Owning Employee</u> and <u>Authorized Craftsperson</u> shall verify that the job is complete and ready to start.
>
> 7.3.11.1    Remove all tools, parts, and excess materials and reinstall all guards.
>
> 7.3.11.2    Check the area around the equipment to ensure that no one is exposed.

(*Id.* at p. 40 (LTTP § 7.3.11)).

Finally, Section 8.2.5 sets forth specific procedures governing "bleed valves":

> 8.2.5    Double Block and Bleed
>
> …
>
> 8.2.5.2    The bleed valve … must be tagged and in the open position.
>
> …
>
> 8.2.5.6    Bleeds must be left open to verify that stored energy has been eliminated and that the blind(s) can be safely installed. Once this is complete, open bleeds that were used to verify zero energy shall be tagged open. In some situations, bleeds may need to be tagged closed (i.e., to eliminate the risk of introducing any unwanted chemical, inert gas, utility supply system, or compressed air, into the system being worked on. Situations where Bleeds are closed must be documented in an ECP.

(*Id.* at p. 43-44 (LTTP §§ 8.2.5)).

Relevant here (for reasons that soon will become apparent), the parties agree that the LTTP applies to the main waterline, *and* that under the LTTP, an employee tasked with energizing the waterline must, at *minimum*, "perform[] a full walkout of the waterline to isolate the water and check for potential safety hazards"; *and* "properly obtain[] the key to the main waterline from its lock box, which includes meeting with any contractors who has [sic] a lock attached to that lock box so that

4

the contractors could [sic] remove those locks." (UOP SOF ¶ 53; Opposing SOF ¶ 53).

### iii.  The October 26 Accident

At all relevant times, Plaintiff was the Authorized Owning Employee of the main waterline that provided water to the "floc mixing station." As such, Plaintiff's job responsibilities included "energizing" the waterline when needed. (*See* UOP SOF ¶¶ 46, 48, 51, 78; Opposing SOF ¶¶ 46, 48, 51, 78; Joint PTO at ¶ F(10)).

On October 26, 2019, UOP needed more "floc." Accordingly, Plaintiff's Front Line Supervisor, Ron Clay, approached Plaintiff and told him that the waterline would need to be energized. (*See* UOP SOF ¶ 48; Opposing SOF ¶¶ 46, 48).

What happened next is hotly disputed. UOP's evidence—consisting of its own internal investigation and Supervisor Clay's deposition testimony—suggests that Plaintiff ignored Clay's direct instruction to delay "energizing the main … waterline until after Plaintiff and Clay performed a full walkout … to be sure that they closed any open bleed valves," and instead unilaterally "energized" the line before Clay could complete a proper walkout. (*See* UOP SOF ¶ 50, 56, 64). Plaintiff counters with evidence—also consisting of Supervisor Clay's testimony, as well as Plaintiff's own sworn statements—indicating that, in fact, Plaintiff conducted his own walkout of the waterline prior to energizing it, that Clay never asked Plaintiff to perform a walkout together, that Clay never mentioned anything about open bleed valves, and even that Plaintiff radioed ahead to warn Clay that he was "ready to turn the … water on." (*See* Opposing SOF ¶¶ 50, 56, 64).

Notably, Plaintiff's evidence also shows that multiple other employees conducted walkouts of the waterline prior to the October 26 accident—including two

5

"Authorized Craftspersons" responsible for "verify[ing] that the job is complete and ready to start" under LTTP § 7.3.11.1. Yet nobody (1) tagged any open bleed valves—a plain violation of LTTP § 8.2.5.2—*or* (2) modified the operative ECP to identify and account for bleed valves on the main waterline—an apparent violation of LTTP §§ 4.8 and 8.2.5.6. (Opposing SOF ¶¶ 60, 73).

Going further, Plaintiff's evidence shows that on October 26, 2019, Supervisor Clay *knew* of the open bleed valves on the main waterline, *knew* that they were not tagged, and yet deliberately failed to tag them, in direct violation of the LTTP's requirement that bleed valves "must be tagged." (LTTP § 8.2.5.2). On this point, Supervisor Clay testified as follows:

> Q. Since you knew about the bleed valves that were opened and you walked the line on October 23rd and October 24th, why didn't you tag those valves?
>
> A. It's not a common practice where we would tag all those valves. I mean once you start hanging a bunch of tags you'd just have tags everywhere. So I mean it's not a common practice then that we had to tag those valves open. But when you walk that system down with the craftsperson, the area owner, the supervisor, you know those bleeds have to be open to verify zero energy is on that line.

(Doc. 33-16 at p. 4).

In any event, two bleed valves were open when Plaintiff energized the waterline on October 26, causing water to unexpectedly spray an area of the facility under active maintenance by a third-party contractor. (UOP SOF ¶¶ 59-60, 62; Opposing SOF ¶¶ 59-60, 62). Fortunately, Plaintiff was immediately notified of the leaking bleed valves, and de-energized the waterline before anyone was hurt. (UOP SOF ¶ 63; Opposing SOF ¶ 63).

6

### iv.  UOP's Investigation Of The October 26 Accident Yields Competing Root Cause Analysis Reports

Although other employees were involved in the October 26 accident, UOP suspended Plaintiff (and only Plaintiff) pending an investigation. (Joint PTO at ¶ F(22)). Interestingly, UOP's investigation resulted in not one, but *two* root cause analysis (RCA) reports. The first, dated October 29, 2019, was drafted by Nicholas Pizzolato, with the assistance of Plant Manager Casey Smithhart and Supervisor Chris Spencer. (Doc. 30-7 at p. 18). Notably, the October 29 RCA  fails to cite any specific provision of the LTTP that Plaintiff allegedly violated prior to energizing the waterline. Instead, the October 29 RCA generally identifies three causes of the October 26 accident—a Physical Root,[5] a Human Root,[6] and a Latent Root[7]:

> Physical Root: "Manipulated LOTO Box to get out key to open up a valve that was isolated for V2 Project Work."
>
> Human Root: "Failure to shut down work, allow affected contractors to remove locks."
>
> Latent Root: "Lack of attention to detail to follow site procedures."

(Doc. 30-7 at p. 19). Notably, the October 29 RCA says *nothing* about whether Plaintiff failed to conduct a proper walkout of the waterline. (*See id.*)

The second RCA is dated November 18, 2019, and was drafted by Brad Jones, again with the assistance of Plant Manager Smithhart and Supervisor Spencer. (Doc. 30-7 at p. 59). In contrast to the October 29 RCA, the November 18 RCA cites multiple

---

[5] Defined to mean "[t]he cause or causes that involve tangible materials that allowed the failure to occur." (Doc. 30-7 at p. 19).

[6] Defined to mean "[t]he last point of human intervention that allowed the failure to occur." (Doc. 30-7 at p. 19).

[7] Defined to mean "[t]he lack of SOPO's, rules, procedures, guidelines, etc. that allowed the failure to occur." (Doc. 30-7 at p. 19).

sections of the LTTP that Plaintiff allegedly violated prior to energizing the waterline: specifically, Sections 4.8 (governing ECPs, *supra*), 7.3.11 (governing startup procedures, *supra*), and 8.2.5 (governing bleed vales, *supra*). (Doc. 30-7 at p. 59).[8]

In another contrast, the November 18 RCA identifies *different* root causes of the accident:

> Physical Root: "The ECP and Line break procedures were not fully adhered to. By not submitting an ECP for proper approval before initiating deviated [sic] from [LTTP] 4.8 requirement. Following proper approval channels would have identified mistakes and omissions."
>
> Human Root: "Failure to stop work (Pull permits) prior to re-energizing the demin water system, and Failure to identify bleed valves with DO NOT OPERATE Tag(s). Failure to walk out system before re-energizing."
>
> Latent Root: "ECP and Line break Training, attention to detail, and failure to comply with a verbal direct order 'not to re-energize Demin water system before walking out system'. Understanding Stop authority."

(Doc. 30-7 at p. 59).

Finally, in yet another contrast, the November 19 RCA specifically *rejects* lockbox "manipulation" as a root cause of the accident, stating: "LOTO box was unlocked an [sic] retrieved key to … unlock demin water valve." (Doc. 30-7 at p. 59).

Significantly, neither RCA recommended any disciplinary action. (*See* Doc. 30-7 at pp. 19, 59). Rather, the "corrective actions" set forth included only coaching and re-training on LTTP procedures. (*See id.*).

---

[8] The November 18 RCA also alleges a violation of LTTP Section "2.5.5.2." (Doc. 30-7 at p. 59). Yet, the LTTP appearing in the summary judgment record does *not* include a Section "2.5.5.2." (*See* Doc. 30-7 at pp. 26-58). Accordingly, the Court disregards this alleged violation for present purposes.

### v. UOP Terminates Plaintiff Citing His Failure To Conduct A Proper Walk Out

Plaintiff was never allowed to return to work after the October 26 accident. Instead, upon completing its investigation, UOP terminated Plaintiff effective December 10, 2019. (Doc. 30-8). Plaintiff was notified of his termination via a letter from Plant Manager Casey Smithhart. (*Id.*). This letter states (in relevant part):

> Effective today, December 10, 2019, your employment is being terminated for cause. As you know, the Company initiated an investigation after you were involved in a safety incident on October 26, 2019. As a result of the investigation, it was determined that prior to energizing the Demin water valve, you failed to properly conduct a walk out of the job as required in Honeywell's Lock Tag Try policy. You were interviewed on November 1, 2019 and admitted to failing to walk down the job as required and stated that you simply went by what the ECP claimed and didn't believe you needed to perform the walk out. The investigation concluded that in addition to your actions violating Honeywell's Lock Tag Try policy, they also violated Honeywell's Cardinal Rule Number 5, which reads, "knowingly violate a life safety permit or life critical procedure: Lockout-Tagout, Confined Space Entry, Fall Protection, Line Breaking or Hot Work."

(*Id.*).

In the end, *only* Plaintiff was disciplined for the October 26 accident, (Opposing SOF at ¶ 104; Reply SOF at ¶ 104[9]), despite *eight* other UOP employees having "walked the line" prior to the October 26 accident. (Opposing SOF ¶¶ 87, 106; Reply

---

[9] UOP "denies" this fact, yet fails to cite any evidence to controvert it. (Reply SOF at ¶ 104). Accordingly, under Local Rules 56(d) and 56(f), the Court deems admitted that Plaintiff was the only employee disciplined for the October 26 accident. *See N. Frac Proppants, LLC v. Regions Bank, NA*, No. 19-cv-00811, 2022 WL 1297180, at *1 n.1 (M.D. La. Apr. 29, 2022) (defendant's proposed facts deemed admitted as written due to plaintiffs' failure to properly support their "qualified" admissions).

SOF ¶¶ 87, 106[10]).

### vi. Plaintiff Reported Multiple Incidents Of Harassment, Intimidation, And Racial Discrimination In The Weeks Before *And* After The October 26 Accident

Plaintiff admits his involvement in the October 26 accident. He even admits that he "dropped the ball" by energizing the waterline without first determining whether the bleed valves were closed. (Doc. 33-23 at p. 33).   Nonetheless, Plaintiff contends that UOP's stated reason for firing him—his failure to conduct a proper walkout—is subterfuge, and that, instead, UOP fired him for having reported multiple incidents of workplace harassment, bullying, and discrimination that occurred between August 20 and November 6, 2019—*i.e.*, the weeks immediately preceding *and* post-dating October 26 accident.

Indeed, the record confirms that Plaintiff reported *six* incidents of workplace harassment and intimidation in this timeframe, involving co-workers *and* supervisors. Plaintiff's first complaint followed a conversation with co-worker Gaylon "Rhett" Hancock. Plaintiff reported that Hancock was talking to a non-Honeywell employee about buying a new car. When asked what color he preferred, Hancock looked at Plaintiff, sneered, and said "not black because he [Hancock] doesn't like anything in the color black." (Doc. 30-7 at pp. 2, 11; *see* Joint PTO at ¶ F(18)).

The second complaint also involved Hancock. Plaintiff reported that on August 27, 2019, Hancock "gave [him] unnecessary work" so that Plaintiff would "miss the

---

[10] UOP also "denies" this fact, yet the evidence UOP cites does *not* refute Plaintiff's assertion that eight other employees "walked the line." (Reply SOF ¶ 87). Accordingly, the Court also deems this fact *admitted*. *See* n.9, *supra*.

sno-cone truck" parked at UOP's facility. (Doc. 30-7 at p. 2). Then, when Plaintiff was distracted, Hancock purchased a sno-cone, spit in it, wrote "Greg's SnoCone" in red on the cup, and surreptitiously placed it on Plaintiff's desk. Plaintiff was upset upon discovering the tampered sno-cone and confronted Hancock. Hancock laughed, and Plaintiff left the room. (Doc. 30-7 at pp. 2, 4, 7, 10-11, 13-15; *see* Joint PTO at ¶ F(18)). After the sno-cone incident Plaintiff requested a shift transfer so that he would not have to work alongside Hancock. Plant Manager Casey Smithhart granted Plaintiff's request, re-assigning Plaintiff to a shift opposite Hancock's shift. (Doc. 30-7 at p. 14).

Plaintiff's third and fourth complaints involved Project Specialist (and Plaintiff's Supervisor of three years) Glenn Barbour. Plaintiff reported that on September 27, 2019, Barbour was recounting his recent hunting trip to Colorado with Plaintiff, Plant Supervisor Jerold Lamkin, and Operator Cedric Jackson. Plaintiff asked Barbour, "Did you kill anything?" Barbour sipped his coffee and responded, "Yea, I killed two little black boys," at which point Lamkin and Barbour began laughing uncontrollably. Plaintiff responded by leaving the room. Despite being the Plant Supervisor, Lamkin did not stop the conversation, attempt to address the situation, or even report Barbour's comment. (Doc. 33-26 at ¶ 12; Doc. 30-7 at pp. 2, 4, 7-8, 16); *see* Joint PTO at ¶ F(18)).

Plaintiff further reported that on two occasions *prior* to the hunting conversation, Barbour told Plaintiff that "he had pulled a gun on a Black person": once when "a Black person … cut in front of him while he drove," and once when "a Black man … was outside his apartment when Barbour returned home." (Doc. 33-26

at ¶ 11; Doc. 30-7 at p. 2; *see* Joint PTO at ¶ F(18)).

Plaintiff's fifth complaint also involved Hancock, as well as Plaintiff's supervisor, Operations Manager Chris Spencer. Plaintiff reported that on October 25, 2019—the day before the October 26 accident—Spencer requested that Plaintiff work late. Plaintiff responded that he did not want to work late because staying beyond his shift would cause him to overlap with Hancock. Spencer became angry, yelled at Plaintiff, and then "stormed out of the office and entered the control room where Hancock was among other contractors and operators." (Doc. 30-7 at p. 16). In a caustic tone, Spencer instructed Hancock, "Don't talk to Greg Thompson at all, he'll be working over for an hour, do not talk to him, there Greg." (*Id.*). Hancock responded "That's fine he can keep that bullshit over in B plant and I hope he's quick … because I got nothin to say to him anyways." (*Id.*; *see also id.* at pp. 2-4, 8-9, 12; *see* Joint PTO at ¶ F(18)).

Plaintiff's sixth (and final) complaint involved Supervisors Barbour and Lamkin and Control Room Operator Dylan Guillot. According to Plaintiff, Guillot is a known racist who used the term "colored" to describe African Americans and frequently commented on Plaintiff's race, saying things like Plaintiff "would be killed if [Plaintiff] drove through where [Guillot is] from." (Doc. 33-24 at p. 77). Plaintiff reported that on November 6, 2019—after Plaintiff was suspended for the October 26 accident *and* after Plaintiff had reported the hunting conversation to Supervisor Spencer and to UOP's Human Resources Department—Guillot unexpectedly called Plaintiff multiple times, and followed with a text message saying: "Going to Precision

12

[an indoor shooting range] tomorrow if u want to come." (Doc. 33-6). Plaintiff knew that Guillot was friends with Barbour and Lamkin and, given Guillot's reputation, interpreted the unsolicited phone calls and text message as an attempt to intimidate him for having reported the hunting conversation. (*See* Doc. 33-24 at pp. 25-28; Joint PTO at ¶ F(18)); *compare* UOP SOF ¶ 24 *with* Opposing SOF ¶¶ 24, 113).

Plaintiff corroborated these complaints (and more) at his deposition and in his sworn declaration submitted with his opposition papers. (*See* Doc. 33-24; Doc. 33-26). Further, the record confirms that Plaintiff raised his complaints verbally to his Supervisors Jerrold Lamkin and Chris Spencer, and that Lamkin and Spencer failed to promptly act on them. (*See* Doc. 30-7 at p. 4; Doc. 33-3 at p. 22). The record also reflects that, in the face of Lamkin's and Spencer's delay, Plaintiff raised his concerns directly to UOP/Honeywell's Senior Human Resources Generalist, Ashley Barnes, on multiple occasions in October and November 2019 (verbally and in writing). (*See* Doc. 33-3 at pp. 17-23).

Finally, the record shows that upon receiving Plaintiff's complaints, Barnes conducted an investigation, interviewing multiple employees including Plaintiff. Barnes concluded her investigation in November 2019, and ultimately confirmed many of Plaintiff's core allegations, including: (1) Hancock said "he didn't want to purchase … a black vehicle," (Doc. 30-7 at p. 11); (2) "a cup with 'Greg's Sno Cone' written on it [was] placed on [Plaintiff's] desk," (*id.* at 4); (3) Supervisor Barbour owned weapons and "ma[de] the comment about shooting two black boys"; (4) Supervisor Lamkin did nothing about Barbour's comment (other than laugh), (*id.*);

(5) Supervisor Spencer asked Plaintiff to work late on October 25, and responded to Plaintiff's objection by "telling Hancock not to speak to [Plaintiff]" despite knowing of Plaintiff's prior complaints, thus making "the situation more uncomfortable for [Plaintiff]," (*id.*); *and* (6) Guillot sent Plaintiff an unsolicited invitation to shooting range in the midst of UOP's investigation into Barbour's and Lamkin's role in the hunting conversation, (*see* UOP SOF ¶ 24).

Significantly, Barnes' investigation resulted in Supervisors Barbour and Lamkin being fired (effective November 21, 2019), Supervisor Spencer and Plant Manager Smithhart being issued "final written warnings," and an express acknowledgment that "[Supervisor] Spencer telling Hancock not to speak to [Plaintiff on October 25] knowing there is an open BCIR between the two made the situation more uncomfortable for [Plaintiff] and should not have been handled that way." (*See* Doc. 30-7 at pp. 4, 5).

### vii. UOP Disciplines Its Black Employees At Twice The Rate Of Its White Employees

Finally, the summary judgment record reflects that UOP disciplines its black employees in Plaintiff's unit at nearly twice the rate of its white employees. (Opposing SOF ¶¶ 131-132; Reply SOF ¶¶ 131-132[11]).

---

[11] UOP "denies" this fact, yet counters with little more than aspirational platitudes, stating, "[UOP] is an equal opportunity employer with a zero-tolerance policy as to workplace discrimination." (Reply SOF ¶¶ 131-132). To the point, UOP offers no evidence to rebut Plaintiff's statistical analysis. Accordingly, the Court again disregards UOP's denial, and also deems this fact *admitted* as set forth in Plaintiff's Opposition to Defendant's Statement of Material Facts. *See* n.9, *supra*.

### B.  Procedural History

After his termination, Plaintiff timely filed a charge of race discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC). (Doc. 1 at ¶ 7). On July 6, 2020, the EEOC issued Plaintiff a right-to-sue letter. (*Id.* at ¶ 8).

On July 14, 2020, Plaintiff initiated this action, alleging claims of disparate treatment based on race, hostile work environment, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), Section I of the Civil Rights Act of 1866, 42 U.S.C. § 1981, *et seq.* ("Section 1981"), the Louisiana Employment Discrimination Law, La. R.S. § 23:332, *et seq.* ("LEDL"), and the Louisiana Employee Whistleblower Statute, La. R.S. § 23:967. (*See* Doc. 1 at ¶¶ 49-57). Plaintiff has since abandoned his disparate treatment and whistleblower claims, leaving only his claims of hostile work environment and retaliation. (*See* Joint PTO at ¶ B).

Now UOP moves for summary judgment, arguing that Plaintiff cannot prove a hostile work environment because he experienced only "a handful of racially derogatory incidents," and, in any event, UOP took prompt remedial action after he reported the incidents set forth above. (Doc. 30-1 at pp. 18-21). UOP argues that Plaintiff's retaliation claim fails because he suffered no adverse employment action after raising his complaints; rather, Plaintiff was fired for cause due to his role in the October 26 accident. (*Id.* at pp. 21-23).[12] Plaintiff opposes UOP's Motion. (Doc. 72).

---

[12] UOP raises multiple additional arguments challenging Plaintiff's disparate treatment and whistleblower claims. The Court does not address these arguments now that Plaintiff has abandoned these claims.

## II.    ANALYSIS

### A. Standard

Federal Rule of Civil Procedure ("Rule") 56(a) provides that the Court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant bears its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587. Stated differently, "[i]f the party with the burden of proof cannot produce any summary judgment evidence on an essential element of [her] claim, summary judgment is required." *Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990).

### B. Discussion

The Court addresses UOP's arguments in the order they are presented in UOP's summary judgment papers.

#### i.  Hostile Work Environment

##### a. Plaintiff has produced sufficient evidence creating a contested issue of fact regarding the severity of the harassment he endured

Generally, to establish a race-based hostile working environment claim[13], a

---

[13] Despite pursuing his hostile work environment claims under Title VII, Section 1981, *and* the LEDL, the analysis is functionally the same. *See La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 477 (5th Cir. 2002) ("Because the [LEDL] is substantively similar to title VII, the

plaintiff-employee must prove: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). The fifth element does not apply, however, where the plaintiff's supervisor committed the harassment. *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353 (5th Cir. 2001), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

UOP challenges only the fourth element of Plaintiff's claim, insisting that Plaintiff cannot show that the harassment and bullying he experienced affected a term or condition of his employment because Plaintiff suffered only "a handful of racially derogatory incidents." (Doc. 30-1 at p. 18).

"For harassment to be sufficiently severe or pervasive to alter the conditions of the victim's employment, the conduct complained of must be both objectively and subjectively offensive." *E.E.O.C. v. WC&M Enterprises, Inc.*, 496 F.3d 393, 399 (5th Cir. 2007) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)).

> Thus, not only must the victim perceive the environment as hostile, the conduct must also be such that a reasonable person would find it to be hostile or abusive. To determine whether the victim's work environment

---

outcome will be the same under the federal and state statutes." (quotation marks omitted)); *cf. Johnson v. Halstead*, 916 F.3d 410, 420 (5th Cir. 2019) ("[R]etaliation claims under § 1981 and Title VII are parallel causes of action, which means they require proof of the same elements in order to establish liability." (quotation marks and alterations omitted)). Accordingly, the Court addresses Plaintiff's hostile work environment claim according to the elements generally required to establish UOP's liability, without specific citation to the various sources of law.

was objectively offensive, courts consider the totality of the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance. No single factor is determinative. In short, a showing that the employee's job performance suffered is simply a factor to be considered, not a prerequisite. … [E]ven without regard to tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality."

*Id.* at 399–400 (quotation marks, citations, and alterations omitted).

Here, the summary judgment evidence shows that in a period of just 11 weeks (August 20 – November 6, 2021) Plaintiff reported six separate episodes of workplace bullying and harassment: (1) Rhett Hancock's statement that he "[didn't] like anything in the color black"; (2) Hancock's act of spitting in a Sno-Cone, writing "Greg's SnoCone" in red on the cup, and placing it on Plaintiff's desk when he was not looking; (3) Supervisor Glenn Barbour's statement that he "killed two little black boys" on his hunting trip, and Supervisor Jerold Lamkin's act of laughing at the same; (4) Supervisor Barbour's statements that on two prior occasions "he had pulled a gun on a Black person"; (5) Supervisor Chris Spencer's act of publicly berating Plaintiff after Plaintiff objected to working alongside Hancock; and (6) Dylan Guillot's unsolicited phone calls and text messages inviting Plaintiff to the gun range, presumably with Supervisors Spencer and Lamkin. Significantly, while UOP disputes the global significance of these incidents, *its* own investigation confirms that they occurred largely consistent with Plaintiff's complaints.

At least the first, second, third, *and* fifth of these episodes occurred in public view, were witnessed by multiple other employees, and, thus, were undoubtedly

humiliating. Supervisor Barbour's statement that he "killed two little black boys" (and Supervisor Lamkin's reaction to the same) is particularly egregious—akin to bragging of a lynching—and, given Barbour's past comments about "pulling a gun" on African Americans, was undeniably threatening. *Cf. Hudson v. Cleco Corp.*, 539 F. App'x 615, 620 (5th Cir. 2013) ("Under the proper circumstances, [displaying a hangman's noose in the workplace" might constitute an 'extremely serious' isolated event causing a discriminatory change in the terms and conditions of one's employment." (citing *Lauderdale v. Tex. Dep't of Crim. Justice*, 512 F.3d 157, 163 (5th Cir. 2007)). Finally, the harassment affected Plaintiff's job performance, as evidenced by the fact that Plaintiff requested (and received) a transfer to a shift opposite Hancock—a request that was ultimately disregarded by Supervisor Spencer on the evening before the October 26 accident.

In sum, Plaintiff has shown that from August to November 2019 he experienced racial harassment and intimidation that was frequent, severe, humiliating, *and* physically threatening, *and* that the harassment interfered with his job performance. For summary judgment purposes, Plaintiff has carried his burden of showing that the alleged harassment altered the conditions of his employment. *See WC&M Enterprises, Inc.*, 496 F.3d at 399-400; *e.g.*, *Johnson v. Hosp. Corp. of Am.*, 767 F. Supp. 2d 678, 716 (W.D. La. 2011) (denying summary judgment and determining that plaintiff's allegations of various offensive and discriminatory incidents occurring within a 10 week period "presented an issue of fact regarding whether the alleged harassing actions … were sufficiently pervasive as to be

actionable.")

### b. Plaintiff has produced sufficient evidence to overcome UOP's affirmative defenses

Additionally, UOP argues that even if "the above-referenced incidents were severe or pervasive," UOP is nonetheless entitled to affirmative defenses to avoid liability under the doctrines set forth in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), and/or *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 265 (5th Cir. 1999). (Doc. 30-1 at pp. 19-21).

At present, this argument also fails. To invoke either the *Faragher/Ellerth* or *Indest* defenses, the defendant-employer must show that "no tangible employment action [was] taken" against the plaintiff-employee. *See Indest*, 164 F.3d at 265 (quoting *Ellerth*, 524 U.S. at 765). Stated differently, "[n]o affirmative defense is available … when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Id.*

As set forth below, Plaintiff's summary judgment evidence establishes a substantial dispute regarding whether Plaintiff's termination was, in fact, retaliation for having raised complaints of his Supervisors' unlawful harassment. It follows that this same evidence establishes a genuine dispute regarding whether his Supervisors' harassment culminated in Plaintiff's termination, precluding application of the *Faragher/Ellerth* and *Indest* defenses at this stage.

### ii. Retaliation

In relevant part, the employment statutes prohibit an employer from punishing an employee for having opposed, complained of, or participated in an

investigation into unlawful workplace conduct, such as harassment and/or discrimination. *See* 42 U.S.C.A. § 2000e-3(a).[14]

Here, Plaintiff lacks direct evidence that he was fired because he protested unlawful conduct—*i.e.*, a "statement or written document showing [an unlawful] motive on its face." *See Portis v. First Nat. Bank of New Albany, Miss.*, 34 F.3d 325, 329 (5th Cir. 1994). Accordingly, the Court reviews Plaintiff's claim under the burden-shifting framework established in *McDonnell Douglas Corporation v. Green. See Robinson v. Jackson State Univ.*, 714 F. App'x 354, 359 (5th Cir. 2017) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

"The first step of the *McDonnell Douglas* analysis requires the plaintiff to establish a prima facie case that the defendant made an employment decision that was motivated by a protected factor." *Turner v. Kansas City S. Ry. Co.*, 675 F.3d 887, 892 (5th Cir. 2012) (quotation marks and alterations omitted). If the plaintiff establishes a prima facie case, the Court proceeds to the next stage of the analysis, where "the defendant bears the burden of producing evidence that its employment decision was based on a legitimate nondiscriminatory reason." *Id.* (quotation marks omitted). If the defendant meets its burden of production, "the burden shifts back to the plaintiff to prove that the defendant's proffered reasons were a pretext for discrimination." *Id.* (quotation marks and alterations omitted).

---

[14] Plaintiff pursues his retaliation claim under Title VII and Section 1981. Again, however, there is no meaningful difference in the analysis, and the Court addresses Plaintiff's retaliation claim according to the elements generally required to establish UOP's liability. *See Johnson*, 916 F.3d at 420, *supra* n. 13.
    .

### a. Prima facie case

To establish a prima facie case of retaliation, Plaintiff must show (1) that he "engaged in protected activity"; (2) that he "suffered from an adverse employment action"; and (3) "a causal connection between the activity and the adverse employment decision." *Robinson*, 714 F. App'x at 359.

### 1. Protected Activity

An employee who raises an internal complaint of discrimination (or participates in an investigation of the same) engages in a protected activity. *See Willis v. Napolitano*, 986 F. Supp. 2d 738, 748 (M.D. La. 2013) ("While opposition to discrimination need not be in formal written form, internal complaints must reference discrimination or other unlawful employment activity in order to be protected."), *aff'd sub nom. Willis v. U.S.*, 576 F. App'x 340 (5th Cir. 2014). Here, Plaintiff engaged in protected activities when he raised his complaints regarding workplace harassment, bullying, and discrimination to Operations Manager Spencer (in September 2019), and again to Senior Human Resources Generalist Barnes (in October and November 2019). Additionally, Plaintiff engaged in a protected activity when he participated in Barnes's investigation of his allegations (in October and November 2019). Accordingly, Plaintiff has established the first prong of his prima facie case.

### 2. Adverse Employment Action

Termination is an adverse employment action. *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) ("We have historically held that, for all Title VII claims, '[a]dverse employment actions include only ultimate employment decisions

such as hiring, granting leave, discharging, promoting, or compensating.'"). Plaintiff
was terminated from his position in December 2019. Thus, Plaintiff has satisfied the
second prong of his prima facie case.

### 3. Causal Link

To meet the third prong, Plaintiff must provide sufficient evidence that his
complaints of harassment, bullying, and discrimination, and/or his participation in
Barnes's investigation caused his termination. *Willis*, 986 F. Supp. 2d at 748 (citing
*Finnie v. Lee Cty., Miss.*, 541 F. App'x 368, 371–72 (5th Cir. 2013)). Such evidence
may include "temporal proximity" between Plaintiff's protected activities and his
termination. *Deeds v. State Farm Mut. Auto. Ins. Co.*, No. CIV.A. 10-142, 2012 WL
1150755, at *9 (M.D. La. Apr. 5, 2012). Standing alone, however, "temporal proximity
… is insufficient to prove but for causation." *Strong v. Univ. Healthcare Sys., L.L.C.*,
482 F.3d 802, 808 (5th Cir. 2007)

Certainly, the timing of Plaintiff's termination suggests a causal link between
Plaintiff's complaints and his termination. UOP terminated Plaintiff on December
10, 2019, approximately ten weeks after Plaintiff first raised his concerns to
Supervisors Lamkin and Spencer; nine weeks after he first raised his concerns to
Senior Human Resources Generalist Barnes; five weeks after he reported his last
complaint to Barnes (regarding Guillot's unsolicited phone calls and text messages);
and just one month after Barnes concluded her investigation into Plaintiff's
allegations, which (again) resulted in Supervisors Barbour and Lamkin being
terminated, and Supervisor Spencer and Plant Manager Smithhart being issued

"final written warnings." (*See* Doc. 33-3 at p. 4).

Multiple additional factors support a determination that Plaintiff's complaints were the but for cause of his termination. First, UOP's Termination Letter listed only *one* cause: Plaintiff's alleged "fail[ure] to properly conduct a walk out of the job as required [by the LTTP]," a knowing violation of a "life safety critical procedure" sanctionable under Cardinal Rule 5. (Doc. 30-8). Yet, Plaintiff testified that he *did* conduct a walk out, putting UOP's stated basis for his termination squarely in the realm of contested fact. Moreover, Plaintiff's evidence shows that *eight* others walked the waterline prior to the October 26 accident, yet he was the only one disciplined. (Opposing SOF ¶¶ 60, 73, 87, 106). Going further, Plaintiff's evidence shows that Supervisor Ron Clay knowingly failed to tag the open bleed lines—a patent violation of LTTP § 8.2.5.2—yet faced no discipline whatsoever for his role in the accident. (Doc. 33-16 at p. 4).

Second, the original October 29 RCA did *not* list Plaintiff's failure to conduct a proper walkout among the root causes of the October 26 accident. (Doc. 30-7 at p. 59). Indeed, this alleged root cause only appeared for the first time in the November 18 RCA, (*id.* at p. 59), which followed just eight days after Barnes concluded her investigation into Plaintiff's complaints (*see* Doc. 33-3 at p. 1). The findings of the November 18 RCA flatly contradict the findings of the October 29 RCA in at least one material respect—specifically, the November 18 RCA rejects the October 29 RCA's determination that Plaintiff "manipulated" a lockbox prior to energizing the waterline—creating a credibility contest regarding the actual cause(s) of the October

26 accident.

Third, neither RCA recommended *any* discipline beyond coaching, and, again, Plaintiff was the only employee disciplined, despite eight others walking the line *and* Supervisor Clay's knowing failure to tag the bleed valves. (Doc. 30-7 at pp. 18, 59).

Fourth, Plant Manager Smithhart and Supervisor Spencer each participated in the October 29 *and* the November 18 RCAs, which, again, reached divergent conclusions regarding the cause of the October 26 accident. (Doc. 30-7 at pp. 18, 59). In the interim between the October 29 RCA and the November 18 RCA, Smithhart and Spencer were each sanctioned for failing to properly address Plaintiff's reports of bullying and harassment. (Doc. 33-3 at 4). Certainly, this created a motive to terminate Plaintiff. Indeed, Smithhart drafted Plaintiff's termination letter. (Doc. 30-8).

Fifth, Plaintiff's statistical evidence shows that UOP disciplined its Black employees at twice the rate of its white employees, a fact that is consistent with Plaintiff's claim that he was targeted for termination for having raised substantiated complaints of workplace harassment and discrimination.

In sum, the summary judgment evidence shows that Plaintiff raised verified complaints of bullying and discrimination, was singled out for termination following his role in the October 26 accident despite others having committed knowing violations of the LTTP, and was fired by a supervisor that had been previously sanctioned for failing to act on Plaintiff's complaints. On this record, Plaintiff has carried his burden of showing a genuine dispute of material fact regarding whether

25

his protected activities were the but for cause of his termination.

### b. Non-retaliatory Reason

Having proved his prima facie case, the burden shifts to UOP to show that Plaintiff's termination was based on a legitimate nondiscriminatory reason. Certainly, an employer may terminate an employee for a knowing violation of a written safety rule or procedures without running afoul of the employment discrimination laws.

### c. Pretext

Thus, the burden shifts back to Plaintiff to show that UOP's proffered reason—a violation of the LTTP sanctionable under Cardinal Rule 5—is a pretext for its actual discriminatory or retaliatory purpose. *Moore v. United Parcel Serv. Co. of Delaware*, No. 11-CV-00619-SDD-RLB, 2013 WL 3821464, at *4 (M.D. La. July 23, 2013). "Once a Title VII case reaches the pretext stage of the analysis, the only question remaining is whether there is a conflict in substantial evidence to create a question for the fact-finder." *Minnis v. Bd. of Sup'rs of Louisiana State Univ. & Agric. & Mech. Coll.*, 55 F. Supp. 3d 864, 875 (M.D. La. 2014), *aff'd sub nom. Minnis v. Bd. of Sup'rs of Louisiana State Univ. & Agr. & Mech. Coll.*, 620 F. App'x 215 (5th Cir. 2015).

Here, again, Plaintiff carries his burden, essentially for the same reasons set forth above regarding "but for" cause. Ostensibly, UOP fired Plaintiff for failing to conduct a proper walkout prior to the October 26 accident. Yet, eight others walked the line *and* Supervisor Clay knowingly failed to tag the open bleed valves. If a violation of the LTTP and Cardinal Rule 5 was the actual basis of Plaintiff's

termination, presumably the same sanction (or at least *some* sanction) should have been applied to Supervisor Clay and the others. Yet, only Plaintiff was sanctioned. And, again, the stated cause for Plaintiff's termination—an improper walkout—did not appear in UOP's documentation until after Barnes concluded her investigation of Plaintiff's complaints. Finally, the fact that the decisionmaker ultimately responsible for Plaintiff's termination—Plant Manager Smithhart—was sanctioned for failing to act on Plaintiff's prior complaints cannot be ignored.

In sum, Plaintiff has again established a genuine dispute that cannot be decided at this stage and must be submitted to the jury.

## III.    CONCLUSION

Accordingly,

**IT IS ORDERED** that UOP's Motion For Summary Judgment (Doc. 30) be and is hereby **DENIED**.

Baton Rouge, Louisiana, this 10th day of June, 2022

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

27